[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This civil action first came to this court by writ, summons and complaint dated November 15, 1988 and returnable January 10, 1989, sounding in two counts and claiming damages, punitive damages, interest and attorney's fees based on a construction contract. On November 15, 1988, the plaintiff applied for a prejudgment remedy which the court, Walsh, J., granted on December 6, 1988, as of record more fully appears. The defendant appeared by counsel which appearance was filed on December 22, 1988.
On May 15, 1989, by agreement of counsel of record, the prejudgment attachment of November 15, 1988 was modified and the modified sum was placed in a joint interest bearing account, approved by Hendel, J.
On May 1, 1989, the defendant filed an answer to the complaint dated April 27, 1989, denying all the allegations CT Page 9354 contained in both counts of the complaint. On May 1, 1989, the defendant filed a counterclaim against the plaintiff dated April 27, 1989 containing two counts seeking damages.
On July 3, 1989, the defendant filed an amended answer to plaintiff's complaint dated June 30, 1989, in which answer the defendant admitted paragraph one of the complaint but denied all other allegations. On November 2, 1990, the plaintiff filed an answer to the counterclaim dated October 31, 1990. On October 18, 1991 and on September 18, 1991, withdrawals were filed as to certain garnishees.
On March 8, 1993, the defendant filed two special defenses to the plaintiff's complaint.
On March 12, 1993, the plaintiff filed a reply to the defendant's special defenses denying the same and the pleadings were closed.
The case came on for hearing before the court commencing on September 15, 1993 and continued thereafter on September 22, 23, 28 and 29, 1993, when the testimony was completed.
On September 29, 1993, upon the conclusion of the testimony, the plaintiff, with leave of the court, filed an amended complaint so as to conform to the proof.
The court, having heard the parties, makes the following findings of fact:
Winfred B. Valentine was the president, chief operating officer, owner and chief stockholder of the plaintiff corporation Colonial Contractors, Inc. Valentine had some engineering background, had been in construction for many years, had been employed by B.N. Baird Construction Co., Farrel Mills in Florida, Metcalfe and Eddy of Boston, Rust Engineering Co., Bechtel Corp. and Stone and Webster on various projects. Valentine had worked at various locations and sites in Florida, Greenwich, Connecticut, Anchorage, Alaska, Puerto Rico, and Brownsville, Nebraska. Valentine had testified in a New York court as a mechanical piping expert.
Valentine and representatives of Burd Building Company entered into negotiations in early January 1988 regarding a site CT Page 9355 located in Jewett City known as Slater Village which envisioned Valentine's corporation doing certain site work, engineering, grading, cutting and filling, clearing and grubbing, installation of storm drains, flares, wing walls, rip rap, a sanitary system, erosion control and maintenance site supervision and mobilization which was finalized in a letter to Valentine dated January 25, 1988 with attachments. See Plaintiff's Exhibit A. Letter from Defendant to plaintiff dated January 25, 1988, Slater Village job. The work itemized in Plaintiff's Exhibit A was to be performed for and in consideration of the sum of $733,225 to be paid by the defendant to the plaintiff in accordance with an agreed billing format for a completed job. Time was of the essence and this project was on a fast track basis. See Plaintiff's Exhibit B and Exhibit N. Prior negotiations between the plaintiff and defendant resulted in Plaintiff's Exhibits A and B (plaintiff's letter of January 28, 1988) which can be considered as the offer of the contract and the acceptance of the same and a meeting of the minds. Certain clarifying data was set forth in Plaintiff's Exhibit C concerning the contract. Valentine was provided with various site development drawings, six sets, see Plaintiff's Exhibit VV. Valentine was engaged in clearing and grubbing the site during March-April 1988.
Certain areas could not be worked on due to wetland designation and possible ancient Indian burial ground until released by proper authority.
Valentine's periodic invoices for March through July 1988 work were paid less retainer. Plaintiff's Exhibit WW notwithstanding.
The defendant's project manager was Russell Morris. The defendant's site superintendent was Chuck Lundberg. The defendant's subsequent site superintendent was Mr. Hawes. The plaintiff's site superintendent was Carl Mattocks.
Daily reports were prepared by both of the site superintendents covering weather conditions, work done, remarks and concerns. See Plaintiff's Exhibit U.
Valentine learned on July 29, 1988 that his company was to be replaced. See Defendant's Exhibit 1, statement by Lundberg as to the problems with plaintiff on the site. Valentine engaged in on site work during the period March through July 1988. CT Page 9356
Defendant received complaints that plaintiff was conducting logging operations in an area designated as wetlands and so marked. See Plaintiff's Exhibit D, letter from Roland J. Harris and Associates to Burd Building complaining of plaintiff's activities on the site concerning unauthorized gravel excavation and unauthorized logging by plaintiff in wetlands.
Valentine personally operated heavy equipment on the job site in restricted wetland area. The plaintiff incident to excavating for piping both storm and sanitary and the installation of said piping did not sandbag the work to keep it in place, did not use plumber's plugs to keep out mud and silt, and did not cover the work at the end of each day to protect the same from the elements. The plaintiff, during May, June and July, hired Lynn Corporation on an hourly basis to provide equipment and personnel as needed and to work on the site under plaintiff's direction. Plaintiff's last day on the job site was August 1, 1988.
At the time the plaintiff left the job site, the work called for in the agreement was only partially performed.
The engineering firm for the overall project was Roland J. Harris and Associates.
The duties of defendant's site superintendent Charles Lundberg were to assist the various contractors, clarify drawings and expedite the project. Lundberg was on the site May through August 1988. Lundberg had 40 years experience in the construction trades. Lundberg provided the defendant with daily reports.
During most of the period March through August 1, 1988, plaintiff had no field engineer or surveyor on the site. See Plaintiff's Exhibit Q, letter from defendant to plaintiff indicating lack of experienced manpower, dependable equipment and requirement of a field engineer.
During the initial phase of the work, Valentine frequently appeared on the job site but after the first three or four weeks, his appearance was infrequent and sporadic. Weeks would go by without Valentine being on the job site to direct the grading, fill movement, excavation work and piping installation.
The manpower provided by plaintiff on the job site on CT Page 9357 occasion was adequate but not skilled. Equipment provided by plaintiff for the site work was inadequate, in some cases defective and not operated by skilled operators.
On one occasion, the Ames building being erected on a portion of the subject site was damaged by the unskilled operation of a front end loader operated by one of plaintiff's employees.
A surveyor hired by plaintiff, one Gomer Davis, appeared on the job site twice during the entire job on weekends.
Valentine performed some rod measurements on the job site although he was neither a surveyor nor an engineer and did not know how to operate a transit.
The plaintiff deviated from the plans and drawings provided, without approval from the project engineering firm on several occasions. See Plaintiff's Exhibit U, letter from defendant to plaintiff protesting plaintiff's deviation from site drawings. See also Exhibit W concerning improperly done work.
Carl Mattocks, the plaintiff's site superintendent, had fifty-four years experience in construction. He was a master mechanic, a member of the operating engineers union, had worked for the Army Corps of Engineers and had participated in construction work on many locations both in the United States and abroad. Valentine came to see Mattocks in March 1988 to seek his help and to be site superintendent for plaintiff.
Valentine told Mattocks in March 1988, "I don't have the requisite equipment for this type of job." Mattocks indicated clearly to Valentine what would be required for a job of this magnitude in terms of equipment and personnel. Mattocks having visited the site also expressed his views as to the control of a water problem on the site.
Mattocks gave Valentine a list of the equipment that would be required. Valentine responded "no problem".
After commencement of the job, the equipment provided was not what was requested.
As to workers and laborers, Valentine told Mattocks, "Hire them off the street". CT Page 9358
Problems with the orderly progress of the work on the job site were due to an absentee boss, old, inadequate or dangerous equipment and unskilled labor.
Valentine gave lines and grades to his site superintendent although he, Valentine, was not a qualified engineer nor surveyor. See Plaintiff's Exhibit EE dated July 29, 1988, acknowledging the fact that plaintiff did not have a field engineer on the site until that date. On one occasion, Mattocks used his own personal credit card to buy shovels, wheelbarrows and the like to keep the job moving.
At the end of July when plaintiff was ordered off the job site, the only completed work was the footings for the so-called Ames building which had not been backfilled.
In August 1988, Valentine met Mattocks and inquired of Mattocks how much money he should have had for a job such as Slater Village. Mattocks replied $200,000. Valentine stated, "I had zilch." The water problem on the job site was never properly controlled by plaintiff, although its site superintendent Mattocks had clearly initially indicated what needed to be done.
Richard C. Hawes came on the job site on July 30, 1988 as an employee of the defendant as a field engineer.
Hawes inspected and evaluated the site and the work done on the site March through July 1988 by plaintiff. Hawes determined that the plaintiff had incorrectly placed and installed catch basins on the wrong side of the curb, had improperly stored and stockpiled material so that it was actually a hindrance to the work, had not protected the piping installations and had taken no safety measures on the job site. Piping was installed at the wrong heighth and wrong slope and pitch. See Defendant's Exhibit 1 and all accompanying photographs.
Valentine was instructed verbally and by letter not to deviate from the site drawings. See Plaintiff's Exhibit U. Valentine was advised by telephone and by letter as to improper installation of S.S. and water piping. See Plaintiff's Exhibit W.
Plaintiff was advised on July 28, 1988 by mailgram that CT Page 9359 as a result of an inspection of the site on July 27, 1988, that the work performed by plaintiff was unacceptable as to quality and schedule.
Plaintiff was given forty-eight hours to remedy the situation with experienced manpower and dependable equipment or in the alternative the defendant would take over completion of the job and hold plaintiff responsible. See Plaintiff's Exhibit CC.
A long list of site problems found at the Slater Village project was provided plaintiff by defendant after another site inspection done on July 29, 1988. See Plaintiff's Exhibit DD.
The plaintiff never completed the grading at the proposed grocery store site.
Russell Morris, the defendant's project manager, left the job site in December of 1988.
Michael Burd was the president and CEO of the defendant corporation. The defendant Burd was a relatively small family business and a Connecticut corporation which had been involved in many projects similar to Slater Village. Michael Burd was a project engineer, a graduate of the University of Vermont, and had served as construction manager on various projects. Michael Burd, as early as 1987, had been involved with the site owner, Slater Village Associates, in meetings with local planning and zoning and project planning. Lynn Construction Corporation was brought on the site on August 1, 1988 by defendant on a cost plus basis to correct and finish the site work. At the time, the plaintiff was ordered off the site, the plaintiff claimed to have completed 53 percent of the work required under the contract. The defendant claimed the percentage of completion to be 47 percent.
At the time plaintiff was ordered off the job site, plaintiff had already received various payments on a periodic basis of $312,590. On October 26, 1988, defendant paid plaintiff the further sum of $37,033.39 after a subcontractor of plaintiff had called defendant complaining of nonpayment for delivery of pipe to the job site.
The total amount paid to Lynn Corporation to properly CT Page 9360 complete and/or correct the work required to be done by the plaintiff under the terms of the agreement was $820,441.78. See Defendant's Exhibit 6, consisting of copies of all the checks. After adjustments and field and material credits as testified to by defendants CEO, the defendant claimed . . . that its total cost to properly complete the project, payments already made to plaintiff, and payments subsequently to Lynn Corporation to be $1,051,208 and the court so finds.
The total cost then to defendant of $1,051,208 less the amount of the contract price of $733,225 leaves a difference of $317,983, which on direct inquiry by the court of the defendants CEO is what is claimed by the defendant on its counterclaim.
Internal credits and debits are taken into account in arriving at the amount claimed by the defendant on its counterclaim when considering change orders, material left onsite and matters of like nature mindful of the amount actually paid Lynn Corporation and the amounts already paid the plaintiff.
The plaintiff made claims for lease of equipment onsite, for change in methodology and retainage.
Plaintiff's claims for equipment lease payments and changes in methodology have not been established by a preponderance of the evidence.
Plaintiff's claim as to retainage is without merit. Plaintiff was actually paid in excess of the 47 percent figure which the court accepts as the percentage of completed work as of August 1, 1988 after a review of all exhibits.
For the function of a retainage, see Rene Dry Wall Co. v. Strawberry Hill Associates, 182 Conn. 568 (1980).
Plaintiff did not earn any claim to a retainage as it was fully paid and more for the work in place at the time of its removal.
As plaintiff never finished the project as originally contemplated, its present claim to a retainage is unavailing. Plaintiff clearly did not finish the project and was removed for cause for inexpert prosecution of the project. See F W Welding Service, Inc. v. ADL Contracting, 217 Conn. 507 (1991). CT Page 9361
The defendant was and is entitled to backcharge plaintiff for expenses incurred in correcting or redoing the inexpert work of plaintiff and finishing the project.
See New Haven Dry Wall, Inc. v. Burd Building, No. 282606 (March 13, 1991), stating in part: "The amounts expended by the defendant, with adequate and timely notice of the intention to proceed in that manner, resulting in no response from plaintiff were reasonable and properly attributable to plaintiff's inadequate performance in the respects claimed."
The many photographic exhibits introduced in this proceeding are mute testimony to the unworkmanlike and inexpert manner in which the project was handled by the plaintiff.
The plaintiff was not equipped nor competent to undertake a project of this magnitude.
The plaintiff was undercapitalized for a project of this size.
While the plaintiff's site superintendent Mattocks was capable and experienced, he was not provided with the proper equipment, tools nor skilled personnel to do the job.
In addition, Valentine basically was an absentee contractor in terms of the careful day-to-day monitoring that this project required and mandated.
Plaintiff's original complaint sounded in two counts, the second one claiming an unfair trade practice prohibited by 42-110(b). At the end of the trial, the plaintiff abandoned any such claim. See the amended complaint filed September 29, 1993.
The plaintiff has not proved nor established its claims as set forth in the amended complaint by a preponderance of the evidence. See Plaintiff's Exhibit WW dated November 22, 1988, purporting to recapitulate plaintiff's claim against defendant. The credible testimony offered during the trial does not support plaintiff's position.
The defendant on its counterclaim has established and proved by a preponderance of the evidence the allegations contained in count one of its counterclaim. CT Page 9362
The allegations contained in the second count of the counterclaim concerning a CUTPA violation have not been established by a preponderance of the evidence.
The court is mindful that the actual total cost to the defendant on the basis of the raw figures is more than $1,051,208. Total cost to Lynn Corp., $820,441.78. Payments to plaintiff by August 1, 1988, $312,590 plus an additional payment by defendant to plaintiff of $37,033.39, resulting in a total outlay by defendant of $1,170,065.17. The court, however, accepts the testimony of the defendant's CEO, mindful as indicated of internal debits and credits of $317,983 as defendant's measure of damages.
The defendant was entitled to have the plaintiff do the work contracted for in a good and workmanlike manner on a fast track basis. The plaintiff did not do it and it cost the defendant the additional monies to get the job done.
The court finds in favor of the defendant on the first count of the counterclaim and enters judgment in the amount of $317,983 in favor of the defendant Burd Building Company and against the plaintiff Colonial Contractors, Inc.
Austin, J.